UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

                            Plaintiff,                    REPORT AND
                                                                        RECOMMENDATION

   -against-

                                                                         07 CR 834 (ERK)(RML)

JEAN ROBERT DARIUS,

                            Defendant.
------------------------------------------------------------X
LEVY, United States Magistrate Judge:

        Defendant Jean Robert Darius ("defendant" or "Darius") pleaded guilty on December 23, 2008 to conspiracy to distribute, and to possess with intent to distribute, at least five kilograms of cocaine. See 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii)(II), 846. On June 15, 2009, the Honorable Edward R. Korman, United States District Judge, referred the case to me for a hearing on the question of whether defendant was "a manager or supervisor" in the criminal activity under United States Sentencing Guideline § 3B1.1(b).[1] I heard argument on July 23, 2009. For the reasons set forth below, I respectfully recommend that defendant be found a manager or supervisor.

## BACKGROUND AND HISTORY

        Defendant was involved in "distributing drugs and collecting drug proceeds" for the Jasme Organization, a drug-trafficking ring led by a Haitian smuggler named Jean Eliobert Jasme ("Jasme"). (See, e.g., Sentencing Memorandum of Jean Robert Darius, dated June 5, 2009 ("Def.'s Mem."), at 4-6.) Other participants in the crimes included co-conspirator Rubens

---

[1] A hearing of this type can properly be referred to a magistrate judge. See United States v. Ballares, 317 F. App'x 36 (2d Cir. 2008).

Jean Edouard ("Edouard") and customer Frantz Saintilus ("Saintilus" or "Fanfan"). Edouard later testified against Saintilus as a cooperating witness. (See Transcript of Trial of United States v. Saintilus, No. 04 CR 133, dated Sept. 14, 2004 ("Tr."); see also Government's Sentencing Memorandum, dated May 13, 2009 ("Gov't's Mem."), at 2.)

At issue now is whether defendant qualifies for an enhancement under U.S.S.G. § 3B1.1(b), which requires the court to increase the offense level by three "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." Defendant concedes that "the criminal activity involved five or more participants" (see Transcript of Oral Argument, dated July 23, 2009 ("Oral Arg. Tr."), at 4:8-12), so the present dispute concerns only whether he was "a manager or supervisor."

The government maintains that "defendant acted as a 'manager' and 'supervisor' because he directly supervised Edouard in connection with each of the[] six narcotics deals." (Gov't's Mem. at 2.) Defendant denies that he "managed" or "supervised" Edouard, arguing instead that he and Edouard "were cousins, friends, and partners in the conspiracy" who "engaged in the same activities at the direction of senior individuals in the conspiracy such as Jasme." (Def.'s Mem. at 1; see also Def.'s Mem. at 11 (stating that defendant and Edouard were "both low-level participants in the conspiracy [and] were equals in the Jasme [O]rganization," that defendant "did not exercise independent control over . . . Edouard," and that "[t]he money that . . . Edouard received from his participation in the conspiracy was not a payment from [defendant] but rather came from the proceeds of the conspiracy as a whole"); Def.'s Mem. at 19 (stating that the two men "were cousins living together [who] had a very close relationship and

engaged in many of the same business activities even prior to the drug conspiracy").) Cf. United States v. Greenfield, 44 F.3d 1141, 1146 (2d Cir. 1995) (stating in dictum that the enhancement is inapplicable when co-conspirators are "equal partners").

Neither defendant nor the government called a witness at the hearing. To support its argument, the government relies on Edouard's trial testimony in United States v. Saintilus and on conversations (primarily in Haitian Creole) intercepted in 2003 pursuant to court-ordered wiretaps of defendant's and Edouard's telephones. (See also Gov't's Mem. at 5-6, 14 (arguing that the intercepted conversations corroborate Edouard's testimony).) Defendant counters that the government's evidence does not establish that he qualifies for the enhancement. (See, e.g., Oral Arg. Tr. at 3:24-4:2 ("[E]ven if the Court assumes everything is true in [Edouard's] testimony, it still doesn't rise to the level of warranting the managerial role enhancement.").) I will summarize the relevant evidence.

### A. Edouard's Testimony

Edouard testified that he joined the Jasme Organization in 2002 at the request of defendant. (Tr. at 146:18-147:8.) He stated that within the organization, defendant was "Jasme's customer" for the drugs that defendant in turn distributed (see Tr. at 151:7-11), but that Edouard never "personally received cocaine from the persons or people who supplied [defendant]" (Tr. at 166:10-14). Edouard remained involved in the conspiracy for nearly two years, participating with defendant in six drug deals and receiving from him two plane tickets to Haiti and approximately $5,000. (See Tr. at 147:9-25.)

Three of the six deals took place in 2002. In the first, defendant and Edouard drove to Queens and delivered one kilogram of cocaine to a customer named Sam at a price of

$21,500. (Tr. at 148:4-8, 149:2-6.) Edouard did not know Sam before the deal. (Tr. at 148:9-11.) He did not see the drugs involved in that transaction, but defendant told him the type, amount, and sales price. (Tr. at 148:15-149:6.) After handing over the drugs, defendant asked Edouard "to collect the rest of the money from Sam for him." (Tr. at 149:7-16.) Sam ended up paying only part of that amount. (Tr. at 149:19-22.) Edouard received approximately $500 for the deal, but it is unclear who paid him that amount. (See Tr. at 149:23-150:7.)

The second and third cocaine sales in 2002 involved a customer named Tony, a cousin of Jasme's to whom defendant had earlier introduced Edouard. (Tr. at 150:18-151:6.) Edouard testified that he "assist[ed] [defendant] in driving to deliver the drugs to Tony" in the first sale, and Tony paid defendant for the cocaine both times. (Tr. at 151:19-152:11.)

The remaining three deals took place in 2003. In the first, defendant "asked [Edouard] to assist him in driving [from Brooklyn to Upper Manhattan] to [Saintilus] to deliver the drugs to him" using defendant's car. (See Tr. at 152:12-154:4.) Defendant phoned Saintilus from the car and told him the drugs were ready, and Saintilus "came downstairs and got inside the vehicle." (See Tr. at 154:6-155:10.) Saintilus spoke with defendant inside the car for ten minutes, and defendant handed him a shoe box containing one kilogram of cocaine. (See Tr. at 155:14-157:4.) Edouard did not see the drugs himself, nor did he know Saintilus before this transaction. (Tr. at 156:11-17, 157:11-12.) Saintilus agreed to pay $22,000 for the drugs "within a week," after reselling the drugs to his customers. (See Tr. at 157:21-158:21.) In the end, Saintilus paid $10,000 to defendant, and defendant "asked [Edouard] to collect the rest of the money owed from the drug deal" because defendant had gone to Haiti. (See Tr. at 157:15-20, 158:22-159:1, 159:12-19.) Although Edouard was unable to collect the remaining $12,000,

defendant paid him $600 for his involvement in the deal, and he understood he would have received more had he collected the balance. (Tr. at 159:2-11.) Defendant later told Edouard that Saintilus had requested more drugs but that he would not provide them because Saintilus had failed to pay in full for the earlier sale. (Tr. at 159:20-160:5, 163:4-10.) Edouard testified that defendant would supply such a quantity of cocaine without immediate payment only to a customer he considered to have proved himself dependable. (See Tr. at 224:4-17.)

In the second 2003 deal, defendant gave Edouard five kilograms of cocaine, which Edouard in turn delivered to a customer named Joe. (See Tr. at 164:23-165:8.) Defendant collected some money from Joe but, as in the previous deal, asked Edouard to collect the balance because he had returned to Haiti. (See Tr. at 165:9-166:4.)

In the final 2003 deal, defendant called Edouard from Haiti and asked him to facilitate the sale of one kilogram of cocaine by an individual called No-no. (See Tr. at 167:24-168:4, 169:13-17; see also Tr. at 163:11-164:15 (explaining that defendant was in Haiti at the time of this deal).) Defendant told Edouard to call Tony; after doing so, Edouard accompanied Tony to a hotel where the latter apparently purchased the cocaine from No-no. (See Tr. at 168:5-169:12.) No-no paid Edouard $800 plus a Prada shirt. (Tr. at 169:20-25.)

While defendant was in Haiti, he worked to organize a shipment of cocaine from Haiti to New York. (See Tr. at 170:1-10.) During that trip, defendant and Edouard had telephone conversations about the shipment, and Edouard attempted to line up customers for the cocaine. (Tr. at 170:11-17.) The shipment never occurred (Tr. at 170:18-19), apparently in part because of Jasme's arrest (see Gov't's Mem. at 5 n.3).

Edouard pleaded guilty on June 22, 2004 to conspiring with defendant to

distribute and to possess with the intent to distribute cocaine. (See Transcript of Criminal Cause for Pleading, United States v. Edouard, No. 04 CR 133, dated June 22, 2004 ("Edouard Tr.").) In his allocution, he stated that:

> I was conspiring with Jean Darius to deliver cocaine and collect money from [sic] him. It started back in 2002. . . . And I've done it four or five times for him, with him collecting the drugs—deliver the drugs and collecting the money. When he is out of the country, I am responsible for seeing through that the clients does [sic] give me the money for it.

(Edouard Tr. at 21:13-23.)

### B. Wiretapped Conversations

While the intercepted conversations ranged over a wide variety of topics, certain exchanges shed light on the question before the court. To begin with, several telephone conversations in August and September between defendant and Saintilus alluded to the latter's outstanding debt. For example, on August 26, 2003, defendant called Saintilus, who told him that "[t]he thing, it's not that I've already forgotten you Pops; You know on these holydays, there are no activities on these days. You understand what I'm telling you? But, I'm regrouping to see how things can be discussed. . . . How much do you find may be left in place?" (Appendix to the Government's Sentencing Memorandum ("GA"), at 3:13-15.) Defendant said that "[y]ou know what you did my friend" (GA at 3:16), and Saintilus replied "I'm working very very hard for you here . . . . Soon as possible you be out. Understand?" (GA at 3:19). On August 29, 2003 Saintilus told defendant that "I have something here I have to give you" (GA at 6:11), but in two additional phone calls later that day, Saintilus reported to him that "[b]ecause, the little thing in my hand was very small, In [sic] had two other transactions out, but it's as though the transactions . . . cannot meet yet" (GA at 11:29), and that "[i]t's how thing seam [sic] to be

turning out, they're not falling in place" (GA at 15:9).[2] Defendant and Saintilus had several increasingly heated discussions in early September 2003 regarding the unpaid debt. (See GA at 20-32.)

Other calls illuminate the relationship between defendant and Edouard. On September 25, 2003, Edouard called defendant and stated, "Ah, this shit country. You made me, you made me, you dropped me in this shit country again?"[3] (GA at 35:22.) Defendant replied, "Ah, hustle, hustle and do the things, so that you can come back permanently. It's nothing." (GA at 35:23.) The following exchange took place later in the same phone call:

> Defendant: Listen, when you, listen you need to pass by . . . Hello?
>
> Edouard: Yeah.
>
> Defendant: Pass by, pass by Joe, take the money, you hear me my man.
>
> Edouard: By Who?
>
> Defendant: Pass by Joe, get the money . .
>
> Edouard: Where?
>
> Defendant: Pass by Joe, Joe, Joe!
>
> Edouard: Oh! Tomorrow morning very early my friend. Swiftly swiftly.
>
> Defendant: OK. Another thing, I'll have you find a partner, uh-h, I'll look for the phone number to give it to

---

[2] The translated transcripts of the intercepted conversations contain many errors in capitalization, punctuation, and spelling, which I will reproduce without further remark.

[3] During all of the phone conversations cited in this section from this point forward, defendant was in Haiti and Edouard was in the United States.

| | |
|---|---|
| | you. The little partner in Manhattan. He has some money for me. You need to check with this guy man. |
| Edouard: | The partner in Manhattan? |
| Defendant: | Fanfan. But I forgot the phone number. |
| Edouard: | Oh, you forgot his phone number? |
| Defendant: | He? I have it written somewhere. I'll look for it for you. |
| Edouard: | Well than OK I'll do that. |

(GA at 36:33-46.)

In a conversation on September 30, 2003, defendant instructed Edouard to perform a variety of tasks, at least one of which related to the drug conspiracy. (See GA at 45:74-47:92 (defendant telling Edouard to call Saintilus, apparently with regard to collecting a debt, and to tell him that Edouard is defendant's "partner").) Edouard telephoned Saintilus later that day, explaining that defendant said "I should call you to ask you how things stand." (GA at 53:15.) Saintilus reported that he did not have the money available. (See GA at 55:46.) In a second telephone conversation between the two on October 6, Saintilus again stated he was unready to pay. (See GA at 63:26-64:32.)

On October 9, 2003 defendant and Edouard spoke about the difficulties in collecting from Joe (see GA at 74:102-76:123), Saintilus (see GA at 76:124-77:144), and someone named Terry (see GA at 77:145-78:158). During this call, defendant did not give instructions to Edouard regarding the debts. (Cf. GA at 76:124-130 (Edouard explaining to defendant his plans for dunning Saintilus).) On October 13, 2003 Edouard again called

-8-

Saintilus, who yet again said he was unready to pay.[4]  (See GA at 90:13-95:40.)  Approximately two hours later, Edouard called defendant, and at the end of a lengthy conversation, told him of his continuing troubles collecting from Saintilus and Joe.  (See GA at 115:192-118:226.)

The final intercepted telephone conversation took place on November 28, 2003. During the call, Edouard told defendant that Saintilus would be traveling to Haiti "next week." (GA at 131:134.)  Edouard further said:

> when he arrives in Haiti . . . what ever he says to you, you can talk archly to him.  He went and told me that, he doesn't have any deals with me, Its something that they left to give to you, something you left so that he could give to me.  Oh!  I had no right to talk to him this way.  I said: "Oh Yeah!  That's how you put it" I said: "You're lucky I didn't take other measures, aside from telling you something that hurts" I said: "You don't know yet, when you arrive in Haiti talk to you, to hear what you'll tell him"

(GA at 131:138.)

## DISCUSSION

"A defendant acts as a 'manager or supervisor' . . . if he [(1)] exercises some degree of control over others involved in the commission of the offense or [(2)] plays a significant role in the decision to recruit or to supervise lower-level participants."  United States v. Payne, 63 F.3d 1200, 1212 (2d Cir. 1995) (internal quotation marks and citations omitted). Here, the government argues that defendant's relationship with Edouard satisfies both prongs. See United States v. Al-Sadawi, 432 F.3d 419, 427 (2d Cir. 2005) ("[I]t is enough to manage or supervise a single other participant.").  The government need prove only one prong, and it need

---

[4] During that conversation, Edouard told Saintilus that "I won't take heat, as [defendant] told me he won't take heat for people, I won't take any heat for [defendant], . . . I won't take heat for myself."  (GA at 93:33.)  At Saintilus's trial, Edouard explained that the "heat" defendant feared was that of his suppliers, to whom he owed money.  (See Tr. at 191:25-192:19.)

do so only by a preponderance of the evidence. See, e.g., United States v. Vaughn, 430 F.3d 518, 525 (2d Cir. 2005) (Sotomayor, J.) (upholding "district courts' authority to determine sentencing factors by a preponderance of the evidence"); see also United States v. Cotto, 979 F.2d 921, 923 (2d Cir. 1992) ("A judge should be rather confident that such an enhancement is warranted before including it in a sentencing decision."). Under the Sentencing Guidelines, defendant either qualifies for the enhancement or does not, i.e., the court has no discretion within the Guidelines to impose a "compromise" or "intermediate" enhancement. Cotto, 979 F.2d at 923.

As for the first prong, the government argues that "the evidence show[s] that the defendant directly controlled all of Edouard's illegal activities." (Gov't's Mem. at 14.) Defendant responds that the evidence shows no more than that he and Edouard were "partners," and that their superiors would deliver joint instructions to defendant, which he would simply relay to Edouard. (See Def.'s Mem. at 14-15.) As for their efforts to obtain payment from Saintilus, defendant argues that he and Edouard each "independently negotiated with" him. (Def.'s Mem. at 15.)

Defendant's theory is not necessarily inconsistent with any single aspect of Edouard's testimony and the wiretaps, but the evidence as a whole makes the government's account much more convincing. Edouard's testimony unmistakably depicts defendant as the rain- and decision-maker of the pair. While the intercepted conversations do not paint quite so clear a picture, they too portray defendant as giving independent orders to Edouard, and they corroborate Edouard's trial testimony.

In sum, the evidence establishes a number of facts relevant to whether the two

men were equals in the conspiracy. Defendant owned the drugs involved in most of the transactions and set up most if not all of the transactions himself. Defendant introduced Edouard to Sam, Tony, and Saintilus. Saintilus considered himself to owe money to defendant, not Edouard. Defendant routinely gave Edouard specific instructions on how to carry out sales and negotiations, and Edouard gave defendant status updates on those tasks. Defendant received cocaine from and owed money to Jasme or other superiors in the conspiracy, but there is no evidence that any superiors knew about the six drug transactions or Edouard's involvement.

Defendant analogizes this case to United States v. Teyer, 322 F. Supp. 2d 359, 374 (S.D.N.Y. 2004), in which Judge Lynch declined to impose the § 3B1.1(b) enhancement on a defendant who did "not appear to have enjoyed independent decision-making authority, or to have given, as opposed to merely relayed, orders," id. at 373-74, and whose role in a large drug-smuggling conspiracy appeared to have been limited to overseeing fellow stevedores "who provided no more than manual labor," id. at 374. Judge Lynch concluded that although that defendant "enjoy[ed] some degree of authority. . . that degree of authority, in the context of the overall criminal conduct at issue here, [does not] qualif[y] as managerial or supervisory in nature, such that [the defendant] bears substantially more culpability than the average participant." Id.

In the present case, however, defendant's role was not limited to directing the grunt work of physically transporting drugs and money; he also dunned debtors, sought new buyers, and supervised a co-conspirator who was aiding him in those more sophisticated tasks. Those facts make the case more analogous to United States v. Garcia, 413 F.3d 201 (2d Cir. 2005), in which the Second Circuit upheld a supervisory role enhancement for a defendant who

-11-

was involved not only in "drug transport" but also in "management of the partnership's finances" and "orchestrating the return of [an] unsatisfactory ten-kilogram shipment of cocaine." Id. at 224; see also id. (noting that "more than one person at more than one level of a conspiracy may act as a supervisor"); cf. United States v. Hertular, 562 F.3d 433, 449 (2d Cir. 2009) (affirming a § 3B1.1(b) enhancement for a defendant who "had greater responsibility over the organization's drug operations than an average member of the conspiracy").

With respect to the deals involving Tony, defendant also urges that the fact that Tony and Jasme are cousins "strongly supports the inference that Mr. Jasme was responsible for the relationship with Tony and that [defendant]—like Mr. Edouard—was merely following the directions of his superiors and servicing a customer of the organization." (Letter of Matthew S. Fitzwater, Esq., and Nicolas Bourtin, Esq., dated July 24, 2009, at 1-2.) It is at least as plausible, though, to infer that Jasme was responsible for the relationship between defendant and Tony, and that defendant, on his own, later brought Edouard into that relationship. (See Tr. at 151:3-4 (Edouard testifying that defendant "introduced me to Tony and he said that Tony is a cousin of a gentleman named Eliobert Jasme").) In sum, the government has carried its burden of proving by a preponderance of the evidence that defendant satisfies the first prong of the Payne test for imposing the § 3B1.1(b) enhancement.[5] Consideration of the second prong is thus unnecessary.

---

[5] The government additionally suggests that Edouard received relatively modest payment for his actions, and that this indicates he was a lower-ranking participant than defendant in the Jasme Organization. (See Gov't's Mem. at 15 (stating that "Edouard received only a total of approximately $5000 in cash, two plane tickets to Haiti and a Prada shirt for his assistance to the defendant in the delivery of 10.5 kilograms of cocaine," and noting that this is a small fraction of the "more than $20,000 per kilogram" the cocaine typically fetched).) But evidence suggesting that Edouard operated at a low level does not help resolve whether defendant operated at an equal or a higher level. (See Def.'s Mem. at 17-18 (contending that defendant pocketed a
(continued...)

**CONCLUSION**

For the reasons stated above, I respectfully recommend that defendant be found a manager or supervisor under United States Sentencing Guideline § 3B1.1(b). Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with courtesy copies to Judge Korman and to my chambers, within ten (10) business days. Failure to file objections within the specified time waives the right to review. See Fed. R. Crim. P. 59; United States v. Ballares, 317 F. App'x 36 (2d Cir. 2008).

Respectfully submitted,

/s/
ROBERT M. LEVY
United States Magistrate Judge

Dated: Brooklyn, New York
       November 10, 2009

---

[5](...continued)
comparable share of the drug sales); see also Oral Arg. Tr. at 21:4-5 (the government conceding that "[t]here's no evidence about [defendant]'s compensation").)